IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 29, 2014

## RICHARD CLEVELAND MARTIN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2005-D-2955      Cheryl A. Blackburn, Judge**

---

**No. M2013-02480-CCA-R3-PC - Filed November 17, 2014**

---

Petitioner, Richard Cleveland Martin, was convicted of first degree premeditated murder and first degree felony murder committed during the perpetration of or attempt to perpetrate a kidnapping. Following merger, the trial court sentenced him to life in prison. After an unsuccessful direct appeal, petitioner filed this petition for post-conviction relief alleging the following claims of ineffective assistance of counsel: (1) failure to ensure that petitioner understood the trial process; (2) failure to request a mental health examination; (3) failure to view the crime scene or interview and develop potential witnesses; and (4) failure to analyze or review a supplemental DNA Report. Upon our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT H. MONTGOMERY, JR., JJ., joined.

Kara Everett, Nashville, Tennessee, for the appellant, Richard Cleveland Martin.

Herbert H. Slatery, III, Attorney General and Reporter; Meredith DeVault, Senior Counsel; Victor S. Johnson, III, District Attorney General; Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts and Procedural History

This court summarized the facts from petitioner's trial in our opinion denying him appellate relief:

This case relates to the death of Angela Richards. At the trial, Jenna Marie Richards, the victim's daughter, testified that she met the defendant at a 2002 Narcotics Anonymous meeting, to which she had accompanied her mother. She said her mother had a substance abuse problem with prescription drugs for as long as she could remember. She stated she met with the defendant five to seven times after that meeting, and she identified him in the courtroom. She said that while she and her brother lived in Florida at the time of trial, her mother had moved to Nashville in September 2004 "to get a fresh start" and to be away from the defendant. She said that her mother and the defendant had been in a relationship and that she and her brother objected to it. She said she and her brother had told their mother that they did not want to have anything to do with her as long as she continued to associate with the defendant. She stated that she spoke on the telephone with her mother at least once or twice weekly, although she said she had not visited her mother in Nashville and did not know where she had been living. She said she only learned the defendant had been in Nashville when she came to Knoxville after her mother's death and spoke with a detective.

Ilesh Patel testified that he was the manager of the Madison Motel where the victim had been found in the defendant's room on July 14, 2005. He said the defendant, whom he identified in the courtroom, stayed at the motel from May 16 through July 2005. He said that the defendant listed his employer as Labor Finders and his home as Lake Park, Florida. Patel stated that he knew the defendant had a girlfriend who sometimes stayed with him at the motel. He said this girlfriend's first name was Angela. He said that there had been an incident two days before the discovery of the victim's corpse when the defendant and Angela had been arguing. He said the defendant came to the manager's office that afternoon for Patel to tell Angela to leave. Patel said he told her to leave the motel because the room was not registered in her name. He said that was the last time he saw Angela alive. He said he saw the defendant the next afternoon or early evening. He said that the following day, when housekeeping arrived to service the room, his employee had difficulty opening the door. He said the motel's normal practice was to clean the guest rooms every second day. He said that the employee came to his office and that he went to the defendant's room, where he saw Angela lying on the bathroom floor.

. . . .

-2-

William Kirby, an officer with the Metropolitan Nashville Police Department's Identification Crime Scene Section, said he arrived on July 14, 2005, around 12:45 p.m. He said his department documents the crime scene and collects and processes evidence. He explained how fingerprints are discovered and recovered from crime scenes. He said that from the doorway of the hotel room, he saw the victim lying face down at the base of the commode on the bathroom floor and that there was a large "blood spot" on the stripped mattress to his left. He said that the victim's face and hands had been bound with tape, that the victim had a washcloth in her mouth, that her ankles had been bound twice with a belt and another article of clothing, and that the victim had been tied to the commode using a telephone cord. He said items, including the contents of a purse, had been thrown around the room. He said the bloodstains, both wet and dried, on the mattress continued over the edge of the bed onto the floor. He said that a drop of blood was on a pair of shower shoes, that bloodstains were on a rug, and that papers were scattered on the floor. He said he saw two wet, bloodstained shirts in the sink. He said that a roll of tape was on the floor and that it appeared to be the same kind of tape as the tape binding the victim. He said the telephone cord missing from the telephone receiver and base was tied around the victim's hands and around the commode. He said a note on the nightstand read: "I'm sorry I don't know what happened I loved her Call her son, Nick Richards. WPB Fla. My Dad Harold Martin 954 973 4233."

. . . .

Charles Hardy, of the Tennessee Bureau of Investigation's Serology and DNA Analysis Unit, testified that he had known DNA samples from the defendant and the victim with which to compare the physical evidence taken from the hotel room and a sexual assault kit taken from the victim. He said he obtained "a mixture of a DNA profile" from the victim's fingernail scrapings, which meant that he had profiles from two people. In the report of his findings provided as discovery, he identified the victim as the "major contributor" to the genetic profile, and he wrote that the defendant "cannot be excluded as the minor contributor." He testified that in his scientific opinion, the defendant was the minor contributor of the profile developed from the victim's fingernail scrapings. He said that although he "normally would not report out statistical calculations" of the probability that someone other than the defendant would have this DNA profile, the District Attorney requested that he generate statistics for the areas of the DNA mixture in which the defendant's profile had been visible. He stated he developed statistics for these five areas in a

-3-

subsequent report in which he stated the probability that someone unrelated to the defendant would have this genetic profile was 1 in 786,200 for Caucasians; 1 in 8,842,000 for African-Americans; 1 in 2,124,000 for the southeastern Hispanic population; and 1 in 20,700,000 for the southwestern Hispanic population.

On cross-examination, Hardy testified that the DNA profile from each bloody item was the defendant's. He said his scientific opinion had not changed since he wrote his initial report. He said that his "conservative" statement that the defendant "cannot be excluded as the minor contributor of the profile" from both the vaginal swab and fingernail scrapings was consistent with his trial testimony that the defendant was "the minor contributor" of the profiles. He stated that he generated these subsequent statistics for the fingernail scrapings only because the District Attorney had not requested statistics for the vaginal swab material. On redirect-examination, Hardy testified that he and defense counsel did not meet before trial, but that he had met with other defense attorneys in other cases, and that he would have met with defense counsel if asked. On recross-examination, he said that defense counsel did not call to request a meeting between the Thursday evening when he gave the subsequent report to the District Attorney and the Monday morning trial date.

Bruce Phillip Levy, the Chief Medical Examiner for the State of Tennessee and the County Medical Examiner for the Metropolitan Government of Nashville and Davidson County, testified that he certified the results of the autopsy, which another medical examiner performed on July 15, 2005, the day after the victim's body was discovered. He said that the cause of death of the victim was asphyxia and that the manner of death was a homicide. He said that the victim had been pronounced dead at 2:30 p.m.

Dr. Levy testified about the body's condition after the examiner had removed the tape and bindings. He said that the victim had scrapes and bruises, swelling around her eyes, and ruptured blood vessels in the whites of her eyes. He said that these ruptured blood vessels could have been caused by both trauma and asphyxia and that because the victim had experienced both, he could not determine which caused the victim's ruptured blood vessels. He said the victim had injuries on her face, her left shoulder, the right side of her chest, both arms at the elbows, her legs, and her hands and wrists. He said that sloughing of the skin on her right leg indicated that "some period" had elapsed between her death and the time of the autopsy the day after she had been

-4-

found. He said the victim had bleeding under the scalp in four specific locations: a large area on the left side, a smaller area on the right side, the forehead, and the back of the head. He said these four injuries were caused by "some type of blunt trauma" to the head, consisting of at least four separate blows. He stated that injuries on the victim's face, particularly around the victim's eyes, were caused by at least three blows other than those that caused the four scalp bleedings. He stated that although there was "no way to tell" from the victim's autopsy if her injuries had caused her to lose consciousness, it "was certainly a possibility."

Dr. Levy testified that because the victim's nose and mouth had been blocked due to the "wrappings around her face and the towel in her mouth," the victim had been unable to breathe. He said that "irreversible brain damage" requires at least four minutes of oxygen deprivation. He stated that the victim was alive at the time she was bound with the cords and clothing because (1) there was no evidence that the victim died from blunt trauma and the victim in fact died from asphyxia; and (2) her wrists, one of the places she had been bound, were bleeding, thereby indicating she had both a heartbeat and blood pressure. He said that it was difficult to state precisely how long someone had been dead using autopsy observations because there was a "lot of variety from person to person" and certain factors can increase or hinder the development of post-mortem physical signs. He said that using the information gathered in the examination alone, the victim had been dead for twenty-four hours before the autopsy. He said that "historical information," however, provided that the victim was alive "approximately eighteen hours" before the examiner made his findings. He stated that the autopsy findings were consistent with a statement that the victim had been dead at 7 a.m. on July 14, 2005. He said the victim was 5'3"and weighed 136.5 pounds.

. . . .

Ronald Petway testified that the defendant, whom he identified in court, told him that he had killed his girlfriend. He said the defendant claimed he "blacked"; killed his girlfriend, "Angie"; and realized what he had done when he "came back to his senses." Although he said the defendant did not tell him precisely how he had killed his girlfriend, he said the defendant did tell him that she was tied to the toilet and that she had died from strangulation or suffocation. He claimed the defendant told him that he killed his girlfriend because he and she had a "real bad argument" and that he could not bear the arguments any longer. He stated the defendant told him that he had fled

-5-

because "he had a hold on him" and that he had attempted suicide by cutting his arm. He said the defendant told him no evidence found at the crime scene linked him to the crime. He particularly remembered the defendant saying that his fingerprints were not on the tape found at the crime scene. He said the defendant told him, however, that because he and the girlfriend had intercourse a few days before the victim's death, the defendant was worried any DNA analysis would show that he raped her. He claimed the defendant had revealed he was going to tell the police that his girlfriend's drug dealer killed her over a debt. He said the defendant told him he "was heavily on drugs" and used them a lot. He also said the defendant stated that drug use made him violent. He said the defendant told him that he had kicked his girlfriend through a door the day before the killing. He stated the defendant told him that he had choked his girlfriend at a bowling alley after an argument, too.

. . . .

The videotape of the interrogation was admitted into evidence . . . .

Initially, the defendant gave the appearance of not knowing that his girlfriend, the victim, was dead. However, [a] . . . timeline developed from his responses . . . .

. . . .

After additional questioning, a second story developed . . . He denied killing his girlfriend.

. . . .

The jury found the defendant guilty of both first degree premeditated murder and first degree felony murder. The trial court merged the felony murder conviction with the premeditated murder conviction and sentenced the defendant to life in prison for first degree premeditated murder.

*State v. Richard Martin*, No. M2007-02097-CCA-R3-CD, 2009 WL 1372287, at *1-12 (Tenn. Crim. App. May 18, 2009), *perm. app. denied* (Tenn. Oct. 5, 2009). Following petitioner's unsuccessful direct appeal, he filed a timely petition for post-conviction relief on September 20, 2010. The post-conviction court appointed counsel, who filed an amended petition on July 25, 2011.

## II. Post-Conviction Proceedings

An evidentiary hearing was held on the petition for post-conviction relief on August 17, 2011, at which petitioner testified on his own behalf and presented the testimony of trial counsel.[1] Trial counsel testified that he was licensed to practice law in 1976 and had been employed with the Davidson County Public Defender's Office for twenty-four years. His representation of petitioner began on April 19, 2006. Petitioner raised several claims of ineffective assistance of trial counsel, and the testimony relevant to each claim will be set forth in our analysis of the issue.

### A. Standard of Review

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The post-conviction court's findings of fact are conclusive on appeal unless the preponderance of the evidence is otherwise. *Berry v. State*, 366 S.W.3d 160, 169 (Tenn. Crim. App. 2011) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App.1997)). However, conclusions of law receive no presumption of correctness on appeal. *Id.* (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this court's review of petitioner's ineffective assistance of counsel claims is de novo with no presumption of correctness. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (citations omitted).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*,

---

[1] Petitioner also called appellate counsel as a witness, but because he has abandoned any claims with regard to ineffective assistance of appellate counsel, we have omitted any reference to his testimony.

145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975)). When a petitioner claims that he received ineffective assistance of counsel, he must demonstrate both that his lawyer's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007) (citation omitted). It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

To prove that counsel's performance was deficient, petitioner must establish that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)). As our supreme court held:

> "[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations."

*Id.* at 315-16 (quoting *Baxter*, 523 S.W.2d at 934-35). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689).

To prove that petitioner suffered prejudice as a result of counsel's deficient performance, he "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). As such, petitioner must establish that his attorney's deficient performance was of such magnitude that he was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

### B. Ineffective Assistance of Counsel Resulted in
### Petitioner's Failure to Understand the Trial Process

Petitioner claimed that he did not have an understanding of the trial process, the elements of the crimes, or what would be required of the prosecution to convict him. Trial counsel recalled that "from the beginning of the appointment until the conclusion of [his] representation[,] [he] . . . had twenty-one contacts with [petitioner] for a total of 10.6 hours." "Contacts" included telephone calls, short visits at the courthouse, and visits at the jail, which varied in length. During one of their meetings, trial counsel reviewed the discovery with petitioner and discussed the proof and evidence against him. Trial counsel maintained that he was able to "adequately and sufficiently explain the evidence" and "the definitional elements of the crimes" to petitioner.

Petitioner testified that he had "enough of an opportunity to speak to [trial counsel] about questions in regards to [his] case." Trial counsel reviewed discovery with him, but petitioner did not "feel" that trial counsel explained the elements of the criminal offenses to him. Petitioner said that he had questions about the criminal trial process and that he did not obtain a thorough understanding of it from trial counsel. On cross-examination, he stated that he had been "in a fog" from the medication during the entire period from arraignment to trial and that his condition had been a contributing factor to his lack of understanding the process. Petitioner acknowledged that at the time of trial, he was aware that jurors would determine his guilt or innocence, that he would have an attorney, that there would be prosecutors, that witnesses would testify, and that physical evidence would be introduced.

The post-conviction court concluded that "[n]othing in the record shows that trial counsel failed to meet with petitioner or keep him informed of the proceedings." We agree with this assessment. The record reflects that trial counsel met with petitioner, reviewed discovery, and informed him about the charges against him and the trial process. Petitioner has not specified how trial counsel performed ineffectively or how he was prejudiced by this alleged shortcoming. Petitioner is not entitled to relief on this claim of error.

### C. Ineffective Assistance of Counsel for Failure to
### Request a Mental Health Examination

Petitioner argues that trial counsel failed to order a mental health examination despite his history of mental health-related hospitalizations and suicide attempts and that such failure was highlighted at trial when petitioner became dizzy and nauseated because of a change in his medications.

Trial counsel testified that although he discussed petitioner's mental health history with him, he did not seek an independent mental health evaluation of petitioner. However, he obtained records from Middle Tennessee Mental Health Institute ("MTMHI") for petitioner's admission shortly following the commission of the crimes. Petitioner had admitted himself using the alias "Harlin Wells." The admission related to suicidal ideations, drug usage, and "possibly even cutting on himself." Trial counsel stated that "nothing from that evaluation . . . implied an ongoing question of competence to stand trial[,] [a]nd from [his] personal contact with [petitioner][,] [trial counsel] did not detect any incompetence to do so." He continued, "Nor was there any suggestion from that contact immediately after the incident that he was insane at the time of the commission of the offense." Trial counsel characterized petitioner as "alert, able to process the information, had thoughts and ideas about his case, some of which were good."

Furthermore, trial counsel opined that "an insanity defense presumed that one committed the act but lacked the intent because of their . . . mental condition" and that petitioner denied committing the crimes. He said, "A mental health defense would have had to put us in a posture of "we . . . were saying he didn't do it but if he did do it[,] then he was crazy[,] [which] [is] not a very effective representation." Trial counsel did not recall announcing to the court during the trial that petitioner was not feeling well or that he had suffered side effects from a medication.

Petitioner testified that he told trial counsel that he had passed out once due to the change in his medication and that he had fallen and cut his eye when it occurred. He also maintained that he was not feeling well enough to make decisions during the trial and that he informed trial counsel as such. He indicated that jail personnel continued to "up" his medication, and he opined that it was because he had attempted suicide and they were trying to keep him stable. For that reason, he did not complain to jail personnel about the effects he was feeling.

The post-conviction court determined that despite his claims to the contrary, petitioner testified that he had an understanding of the roles of the various parties and witnesses and that he understood the charges against him. It further concluded that petitioner had not established deficient performance or prejudice. We agree with the post-conviction court. Specifically, we note that "if a petitioner seeks to establish deficient performance based upon trial counsel's failure to employ an expert witness, then it is incumbent upon the petitioner to call a witness at the post-conviction hearing to establish that the witness's testimony would have benefitted the petitioner and that prejudice has resulted." *Anthony M. Clark v. State*, No. M2006-01176-CCA-R3-PC, 2007 WL 2295583, at *9 (Tenn. Crim. App. Aug. 6, 2007) (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). Petitioner has established neither deficient performance nor prejudice, and he is not entitled to relief.

D.  Ineffective Assistance of Counsel for Failure to View the Crime Scene
or Interview and Develop Potential Witnesses Whose Names Petitioner Provided

Petitioner asserts that trial counsel neither viewed the crime scene nor developed a witness to testify on petitioner's behalf.  Petitioner said that he supplied trial counsel with the names of potentially exculpatory witnesses from the motel, the bowling alley where the victim was employed, and the labor office where petitioner was employed.  Trial counsel testified that at his behest, another assistant district public defender went to the motel to interview the owner/operator, Mr. Patel, who discovered the victim's body.  Although trial counsel's file was devoid of any further information with regard to the interview, he "assume[d]" that they did so.  He recalled that Mr. Patel was "extensively" questioned by the police.  Trial counsel further stated that he did not interview any of the residents of the motel and that his file bore no indication that anyone did so at his direction.  He was unaware of whether anyone from the bowling alley was interviewed and stated that if someone from his office had made a contact there, "it certainly wasn't a significant one."  Neither did they question anyone from petitioner's employment who may have witnessed petitioner and the victim together on previous occasions.  Trial counsel did not think it was relevant to present testimony that petitioner and the victim had shared good times together in their relationship.

Petitioner stated that he provided trial counsel with the names of potential witnesses, including people from the bowling alley where the victim had been employed and the labor office where he had been employed.  He said that witnesses from the bowling alley would have testified that they never heard him raise his voice to the victim and that they "definitely" never saw him reach across the counter and choke her.  They would further have stated that he brought her breakfast on the weekends and dinner during the week.  He also walked her to and from work because of the neighborhood where they lived.  Petitioner expressed that people from his employment would have testified similarly about their holding hands and being "lovey dovey."

The post-conviction court noted that petitioner did not present at the post-conviction hearing any of the witnesses whom he wanted trial counsel to develop and that he, therefore, failed to demonstrate prejudice resulting therefrom.  We agree with the post-conviction court's assessment.  "To succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *Black*, 794 S.W.2d at 757). "'As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which enured to the prejudice of the petitioner.'" *Id.* (quoting *Black*, 794 S.W.2d at 757).  Without such testimony, the post-conviction court is unable to

ascertain whether failure to call the witness enured to petitioner's prejudice. For his failure to present those witnesses at the post-conviction hearing, petitioner is not entitled to relief.

### E. Ineffective Assistance of Counsel for Failure to Analyze or Review a Supplemental DNA Report Provided on the Eve of Trial

Petitioner maintains that trial counsel did not analyze or review the DNA report that was provided to him just prior to trial and that he was prejudiced by this failure because the State's expert provided inaccurate and incriminating testimony and petitioner could not refute it because of trial counsel's unfamiliarity with the document. Trial counsel received supplemental discovery on the Friday prior to the trial beginning on Monday. He described it as "one page of data." At first glance, trial counsel thought the document was unimportant; it appeared to be an "insignificant" numerical base for forthcoming testimony. However, trial counsel said that his understanding had been "completely wrong." He said that the special agent's testimony at trial differed from the content of his report and that at trial, he gave "a much more definitive statement indicating the presence of [petitioner's] DNA in a couple of the samples that were mentioned."

Trial counsel explained that he was provided the document by an assistant district attorney who was not involved in petitioner's prosecution. Therefore, no one was available who understood the contents of the document. When he reviewed it later that day, he ascertained that he had no idea what it was. He admitted that he "should have been more vigorous in trying to find out what the columns of data were."

On cross-examination, trial counsel acknowledged that petitioner and the victim had been in a romantic relationship and that petitioner had admitted that the victim had scratched him. The DNA report had indicated that the DNA under the victim's fingernails contained a combination of the victim's and petitioner's DNA. However, trial counsel attempted to draw a distinction between the original report that read, "'[Petitioner] cannot be excluded as a contributor,'" and, "'[T]he chances [that] someone else was the contributor were one in . . . 786,2000 Caucasian males." Trial counsel viewed that assertion as being "a lot more certain than saying he can't be excluded." As to his preparation for trial, counsel indicated that had the original report been more definitive, he might have been "inspired" to consult with an expert in DNA to challenge the "statistical projections." In his testimony, petitioner simply said that he could not recall whether trial counsel attempted to explain the supplemental discovery to him.

The post-conviction court noted that this issue had been raised and addressed at trial in a jury-out hearing and on direct appeal. Post-conviction relief is not available to relitigate issues that have been raised and litigated on direct appeal. *Forrest v. State*, 535 S.W.2d 166,

167 (Tenn. 1976).  Excerpts from this court's opinion on petitioner's direct appeal are set forth above.  It is clear that trial counsel raised the difference between the original DNA report and the expert's testimony at trial in a jury-out hearing on a motion for a mistrial and that disclosure of the supplemental report was not timely.  *Richard Martin*, 2009 WL 1372287, at *22-23.  The trial court noted that because the jury would hear petitioner's statement wherein he admitted that the victim scratched his neck, his being a "minor contributor to the DNA profile developed from the victim's fingernail scrapings would not be surprising to either party."  *Id.*  This court agreed that the trial court did not err in denying petitioner's motion for a mistrial on this basis.  *Id.*

## CONCLUSION

Based on the record as a whole, the briefs of the parties, and the applicable legal authority, we affirm the judgment of the post-conviction court.

_____
ROGER A. PAGE, JUDGE